My name is Bill Peterson. I'm a lawyer for the law firm of Snell & Wilbur, and I represent the appellant and the cross-appellee in this case, Sierra Pacific Power Company. Three weeks ago, or three weeks from now, basically from today, there was a huge flood, a Truckee River hundred-year flood that destroyed the Farrah Dam, and we're still litigating that case today. Yeah, I have sort of a basic question here, and that is whether the parties have made any use of a mediation unit. This is a case all about money and, you know, not about prison term or anything like that. Is that something that would be beneficial? The thing about your honor, and the reason I say that is, as you know, this is the second time this case has been opened in the circuit. The first time, probably not coincidentally, the same question was posed, sort of answered differently the first time. And, in fact, the case was adjourned, or we did go back to mediation. Okay, you don't need to tell us the details. It sounds like it's fair enough if the parties are not interested. Basically, as I understand it, there are two choices. You can either rebuild the dam and get full coverage, or you can decide not to rebuild and get the cash value, and you can elect between those. Is that a correct understanding of the two options? I would agree with you 100%. I'm not sure that the carriers would agree, and I think that's part of their cross-appeal. That's your position. That's correct. It was brought up at the end of my appeal in counsel. Yeah, but you're certainly not seeking to change what you think the district court has held. No. Which is what Judge Graber said. I am not. No. So let's, the only thing you're complaining about in your appeal is the depreciation finding. It is the depreciation finding, Your Honor, and that it slightly alludes to the cross-appeal because the judge in this case... But he corrected it. He corrected it. So whether he's wrong or right or wrong, you're not seeking to change what the judge did. No, I only raised it because he corrected it after I filed my notice of appeal, but under rule, I believe it's 62. He can do that. So let's just focus on depreciation for a second. Yes, very good. There was testimony by the insurance adjuster that he had applied a 50% rate of depreciation to them and 5% to the West Wing. Yes. Wing. Wing, I'm sorry. The West Wing, that's correct. It was on the West, actually. It was on the West. It wasn't the Wing on the West, either. You know, that's a... It doesn't matter. I don't know. Okay. That's a good question. Put that aside. 50% and 5% he testified to. He also testified that your clients agreed to it. And the first appeal, I think, suggests there's no evidence of an agreement. Only apart from the agreement, there was testimony in the record, unobjective to, at trial, by this adjuster that there was a 50% depreciation rate and a 5% rate. Wasn't that enough? Evidence for the judge to make his mind? You know, I think you hit the nail on the head. You know, if I can... That's the second time I've been at this. Well, you know, I think... I want to make sure I hold that. I think, if I can put it in the language that I think, that I understand best, I think what you're saying is, isn't there substantial evidence? Isn't that testimony substantial evidence? Right. It ain't much, but it's something. Yeah, I'd say it ain't much, but it's something. Okay. Well, there's two things about that. One is, that very evidence was addressed by the previous panel. Well, that's why I phrased my question that way. The previous panel said, no, there was no agreement. They said more than that. Well, I'm not sure they did, and that's why I need your help. I think the previous panel said different. You said there was an agreement with respect to ACV. Well, what they said... The first time through insurers, you said there was an agreement as to ACV. That's wrong. There was no agreement. Right. But only a part of whether there was an agreement didn't. Mr. Jeremy testified that we calculated a 50% depreciation rate and 5% for the wing, and they agreed to it. So cut off the part that says that they agreed to it. What did the first appeal say with respect to ACV? It says two things, but before I forget, I want to disamuse you of the fact that there was a calculation. There was no calculation. It was just a bunch of claims adjusters looking at a bunch of... I know. I know. I said it was very thin, but he did use the word calculation. Okay, but back to my first point. The Ninth Circuit, the previous panel said two things about this, and they addressed that very point, and you are correct. They said Judge Hicks is wrong in concluding that there was an agreement. In fact, Judge Hicks also said there was an agreement. But they did address that very piece of evidence. They addressed two pieces of evidence in the previous panel. One was the alleged agreement, and the second was the e-mail about the 50% depreciation. What the previous panel said about that evidence was that that evidence was merely a recommendation by the broker. Right. That's the broker's. I understand. Put all that stuff aside. I'm nonetheless left, when I look at the record of the first trial, and I start out by saying it's not a lot, but Mr. Jeremy says we calculated a rate of 50%. It doesn't go into any foundation on it, but there's no objection. And then they agree to it. Then there's also some separate evidence about the broker sending an e-mail about it. So focus just on what Mr. Jeremy said. Okay. I see you're not impressed with my first argument. The point that I was trying to make was I believe the point you already made, which was thin as it may be. Don't forget it has to be substantial evidence, which is evidence upon which a reasonable person could come to a conclusion. And whether that is or is not, I don't believe that it is. Secondly, and this may be more importantly to your point, that is it doesn't really matter what they say because the rate, not the rate, but the depreciation methodology and the amount is not a question of fact. The methodology is a question of law. And so it would be wrong for the judge to say I find this to be substantial evidence because a broker or an adjuster said I think it's 50% when, in fact, the law says this is how you determine depreciation. That is what the judge should be doing. The methodology is, he doesn't get to pick the methodology and say that the adjuster. So under your argument, let me just work this a little bit. The dam was rebuilt, originally built what, 1890 something? It was rebuilt, completely moved in 1960. 1960. The first one lasted about 60 years. Is that right? Yeah, I guess that's right. And we're now, we're 30-something years into the second one. Right. How should the judge have calculated the depreciation? He should have done it in the way that is laid out in the cases, in the commentary, in the recognized appraisal methodology. And there's no dispute, there's absolutely no dispute about it. But you argued there was no depreciation at all. I did. I did. The judge rejected that. The Ninth Circuit rejected that. Okay, so let's assume that there is some depreciation. Just tell me how he should have calculated it. I know he should have done it the right way, but just mathematically tell me how he should have done it. The math is this. And the math is laid out by the Ninth Circuit in the previous panel. Actual cash value equals fair market value. Right in the previous order. Minus depreciation. No, actual cash value equals fair market value. Fair market value equals full replacement cost minus depreciation. Counsel, the one thing that I haven't heard discussed in your colloquy with Judge Hurwitz is, if I'm remembering it correctly, Jeremy testified that the 50% depreciation and the other numbers were not objected to. That these were agreed upon numbers. And I think that the court relied on that to a great extent. So what effect does that agreement or lack of protest at the time have on our analysis? Well, the judge can consider the evidence because I didn't object to it. But that doesn't mean that he's entitled to rely on it. Well, no, no. But it was more than that you didn't object to the evidence. The testimony itself was that there was agreement as to the numbers that were being testified to, which is not about the evidence. It's about the calculation. Well, I should have already said that there was not an agreement. But the judge also found there was a lack of objection. Right. And he documented that by going back to the record and saying, look, I'm not saying there was an agreement. I did say it, but I do think there was a lack of objection to it. Oh, I agree. I agree. Well, Judge Baker's question in faith was. He's going to say it better than I do. Keep going. Doesn't Jeremy's testimony, he calculated this, and his testimony of the other side didn't object to it together. Isn't that substantial evidence? No. No. The judge is not the judge. I'm certain all of you judges, I know the trial court judge, have done condemnation cases before. It doesn't matter what the evidence comes in on a condemn. When you're valuing, your valuing is covered by the evidence code in California. Valuation is the same valuation methodology used whether it's a tax case, whether it's a condemnation case, or whether it's an actual tax value case. The methodology is clear. And the judge can hear all kinds of evidence on that. But he is not free, the judge is not free, to pick a different methodology than the methodology required by the law. So applying the methodology, and I'm still not sure you've told me how it works. I'd love to do that. Applying the methodology required by the law, tell me what the depreciation was. I'm telling you the depreciation is nominal. I know, but the trial judge rejected that, and our prior panel. He's wrong. Our prior panel was wrong too. No, no, no. The prior panel did not say that. What the prior panel said was, Mr. Peterson, you are wrong when you say that we may not deduct depreciation. And I agree, you may deduct depreciation, but the question that is posed to the trial court is, how much? That is the question. I never told the Ninth Circuit, I never told the trial judge. And you really think that it's reasonable to conclude, I mean, just as an overview matter, that a 60-year-old dam has basically no depreciation? Because that's the methodology. Look at it this way. Well, you were the one who said it has to be actual value, which looks at depreciation. Look at it this way. I'd like to go back really to the math, because the math lays it out very clearly. Because the real world is problematic when you look at a 60-year-old dam. I'll let you do this in a second, but I want to just focus on Judge Graber's question. You've got a dam that was built in 1960, I think. Yeah, for the Winter Olympics. They had to move it. Creosote? Creosote. Logs? Creosote logs. It's 40, how old at the time? Almost 40 years old. Older than that, 50. I think it was 60. It's not 60, but 50 years old. What are you talking about when the flood occurs? Yeah, it's about 50. It's almost 40 years old? Well, 34. I think it's 60. It's old. If you're under 40, you should know. So, do you think that's exactly the same? A dam of that age has exactly the same actual cash value to acquire a brand new one? I do. Because they go on for 100 years, and that's also an issue. But they go on for 100 years, and it's 34% depreciated. This is not some piece of equipment that somebody keeps in a backyard or a construction yard. You're talking about a power plant. Say it again. I'm sorry. You can finish your answer. I was going to say, you know, it's in my brain for these things to go over 100 years. They're regularly maintained. They're checked every day. They're always watched. They produce electricity every single day, which is why they're maintained in tip-top condition. The judge agreed it was in tip-top condition. That wasn't in dispute here. I'm sorry. What evidence did you put on that there was a depreciation? The evidence I put on was also recited by the trial judge and disregarded by him. It's right in his order. What he said was, okay, so the dam was perfectly well-maintained, and it is operating at full functionality with his orders. He says what you guys are saying right now, which is basically, okay, I agree with all that, but that still doesn't account for the age and life expectancy of the dam. So he falls back on exactly what you all are saying, and that is wrong, because the age and the life expectancy of the dam are not factors you consider in depreciation analysis. It's fair market value. Did you have any evidence that you put on expert evidence of that conclusion? No, Your Honor, what I was arguing to the court was that the value of that dam, if you use the three appraisal methodologies, I'm sure that you're familiar with, reproduction cost, income analysis, or comparable sales. Those are the ways you do it. If you apply those factors and you look at the evidence that was presented, that I presented for Craig Williams, this dam is in tip-top shape. It's maintained every day. It diverts water and produces 2.7 megawatts of electricity every single day. The value of that dam is precisely the same as if you had taken it out and built it with gold. If you built a gold dam, it wouldn't be worth one penny more than what it was worth in a creosote dam because it produces the same income and it has the same function of diverting water and protecting the water rights, which is why I was telling the trial judge, please use your correct methodology. Didn't you argue, and I'm trying to find your briefs here, so I'll find them later. Didn't you argue to the Ninth Circuit the previous time through that what you should recover is $19,800,000 as actual cash value? Because that's the reproduction cost of the dam. Right. So therefore you argued to the Ninth Circuit that no depreciation should be taken off of that number. Well, I didn't really. No, you did. You said, here's $19,800. That's the estimated reproduction cost. I should get it all. And the Ninth Circuit said in the prior appeal, no, no. The court has to calculate depreciation. No, no, no. What the Ninth Circuit said was Judge Hicks, the policy language says actual cash value with proper deduction for depreciation. With proper. What's the proper deduction for depreciation? It could be zero. Your argument was zero. The Ninth Circuit was zero. Because the value of that dam is the same. It has not depreciated. In fact, the Ninth Circuit remanded, nonetheless remanded for Judge Hicks to calculate depreciation. And it says demand for determination of the actual cash value based on reducing the replacement cost of $19,800,000 by the appropriate depreciation. I want to have a couple of minutes. This may put it together for you. Everybody has bought a car. I'm sure you've all bought a brand new car. You buy that car. Let's say it's a brand new Cadillac. You drive it off a lot. You decide, six hours later, oh, I really like this car. You return that car. You decide to sell that car. It is in precisely the same shape as it was. You couldn't tell the difference from the unused car to the used car. That car has depreciated $5,000, $6,000, $10,000. Why? It is because you take the math, which is the same math which applies to this dam, which is what is the cost of this thing? It is the reproduction cost, less depreciation equals fair market value. The fair market value of that Cadillac is $15,000. You paid $20,000 five hours earlier. How much has it depreciated? $5,000. It's the same formula you use in every single case. Council, I think we understand your position. And if you want to save rebuttal time, you might wish to do that. Thank you. I'm sorry to be so forceful. That's okay. Yes. We gather. It's effective. Don't worry about it. Good morning, your honors. My name is David Blanton. I represent the insurers. I take a medicine that drives me out. Feel free. I think we are doing the same up here. It was something entertaining. Let me straighten a couple of things out here first. To answer the first question you asked, Judge Graber, the policy says we will pay replacement cost. The policy then says if you don't replace within two years, we will pay actual cash value, which is measured by replacement cost. Right. And the two years in the previous iteration of this appeal was held to be functional. So the two years is done. So with the two years done, there's still the two options. You can either actually rebuild it or you can get a cash amount. I phrase it slightly differently. You can always rebuild it. And even if you haven't yet rebuilt it, you still get actual cash value. So it's not a choice. It's a choice to rebuild or not. So we've been arguing a lot about the first appeal here. As I read your cross-appeal briefs, you sort of seize on a misstatement that the trial judge made in the second go-round and say if they do choose to rebuild, all they get is $19,800. That's right. And the first time through, that's not what the judge held, and we affirmed the judge ruling the first time through. No, of course. The judge made the policy is clear, is it not, that what you get if you rebuild are the actual costs of rebuilding. No, that's not true. Well, that's what our previous panel said. I respectfully disagree because Judge Foote just read what the panel said. The panel said in remand for a determination of the ACV. That's with respect to the ACV. Reducing the replacement cost of $19.8 million. I know. But that's only for the cash. That's for the ACV. When one does an ACV, using the estimated replacement cost as a surrogate for fair market value, you can't know what the actual cost of reconstruction is. Actually, you can, Your Honor, because the policy tells you how. The policy says that you have to determine the point at which, with due diligence and dispatch, the insurer could have replaced. I understand, but we had a previous appeal in this matter. One of the things you appealed the previous time was the argument, was the judges ruling that they could get the actual cost of reconstruction were they to rebuild. And the court rejected your appeal on that issue. I respectfully disagree. It says they also, the last time through, affirmed the holding that the coverage available under the policy includes the costs necessary to comply with current regulatory requirements and building codes if there is actual replacement undertaken. And that has nothing to do with the ACV. Well, I think we're kind of off on the... We're off on your cross appeal. Well, I understand you're on my cross appeal, and that's fine. I'm happy to deal with my cross appeal. Two things happened in this situation. One, the court has to make a determination as to when the property could have been rebuilt with due diligence and dispatch. The trial court made that finding a fact. It's in this supplemental excerpt of record, page 7. Finding a fact 26G, the trial court said the actual time necessary to rebuild and replace the Fair Ed Dam with diligence and dispatch is three years following this court's findings effective. And you're no longer contending that they didn't do it within the appropriate time period. Right. I understand that the trial court and the appellate court ruled that we lost on that issue. We lost on that issue. So the only question is, should they choose to rebuild, which I doubt that they will, but should they choose to rebuild, do they merely get $19,800 or do they get whatever it actually costs to rebuild and get $19,800? That's your decision. That's not what we said the last time. I'm asking you a different question. That's the question, is it not? Isn't that the question before us? No. No, that's one of the questions. My question is, how is this within the mandate? How is any of this within the mandate? Well, that's my problem, see, because I think it's not within the mandate. You lost the first time. That's my view. That's my view of what we did last time, too, because I understood our previous decision to say that if there's a replacement, not only do you pay the full value, you pay the full replacement cost if it's rebuilt, even if it's bigger than it would have been because of new regulations and ordinances of fees and so forth. But all those costs are already in the $19,800. That's an estimate, is it not? Your Honor, is it not an estimate, yes or no? It was a fact at the time of the trial. That's not the question. You know, we can waste time reconstructing things, but it is an estimate. Nobody knows how much you will actually cost. It was called estimated cost. Right? I'll give you an estimate. Okay, thank you. And we use that estimate because there's nobody out there buying dams. Otherwise, we could find fair market value by comparable sales. So when we look at actual cash value, the trial court says, and we said the first time through, use estimated replacement cost as a surrogate for actual cash value. And then take the depreciation off it. That's the other part of this appeal. But we didn't disturb the trial court's findings with respect to replacement, to actual reproduction cost, did we? Actual reproduction cost at the time that is relevant for $19.8 million, Your Honor. See, the problem here is. That's not what we said, though. I think it is what you said, quite frankly. That's what the trial court said, and nobody appealed it. The trial court made that finding affect 26G. All right, Mrs. Woodson, as we affirm the district court's finding that the coverage available under the policy includes costs necessary to comply with current regulatory requirements and building codes. That's already in the 19.8. No, that's not. The 19.8 is already dealt with from that. Anyway. Well, I will tell you as a matter of fact, Your Honor, the 19.8 includes all the code regulation requirements to meet new codes. Otherwise, this was a creosote dam. It wouldn't have cost $19.8 million to put back a creosote dam. This has got all the regulations in it. It's got fish ladders so the fish can swim upstream and not get diverted by the dam. The sole function of this dam is to divert water down the floor. That's all it does. Maybe we just have a different view on this, but I'm reading the trial court's findings the first time through. S.E.R. 8. Policies of insurance provide Sierra with full replacement cost coverage subject to the sublimit of liability. And we can forget those because they're so simple to apply here. The judge did not find the first time through that full replacement cost coverage was 19.8. He found that the estimated cost of replacement was 19.8. Go back one page, Your Honor. Go back one page. Yeah. Look at 26G. The actual time necessary is three years. The time to rebuild with due diligence and dispatch, and that's what the policy says is the trigger. Okay, but time and amount are two different questions. The findings about time don't undermine the part that the judge always was making. You'll have to focus on some specific period of time. The question is what is the actual reproduction cost at that point in time? But let's go to the 50%. But the point is. I can see why we've been litigating this for 20 years. Yeah. If we rebuild this in 2075, where it's going to cost $50 million to replace it given the increased costs, I mean, how long does this go on? How long do they have to do this? The point of these policies is we don't know exactly what the cost is, but they get an estimate, they present it, and they have a replacement cost. And if they'd actually done it, we would have known. Well, but it's hard to cast blame on this one, personally on their side. They came up, they had a bid after all of 16K back in those days, and you offered to move it, I'm moving it too. So it's obviously wrong in our view of the policy, but it wasn't that bad. I know, but I mean, so both sides have been wrong. So don't, I mean, I'm wearing a white hat. White's great. You dislike my hair? It's not, it's not, the problem I'm suggesting is it's not all that useful to argue the equities here, since they're, they seem to be on both sides. I agree with that. Do you want to talk about the 50%? Well, I do. And here's, let me just, let me, so you can repeat what I said to your colleague. I think all we said the first time through was that there was no agreement as to ACV. And I think that fairly can be read that we also found that there was no depreciation costs, but okay. So is it enough for us to find depreciation for your adjuster? Just to say, well, I calculated 50% because that's really all you got. Well, here's the problem here. It's your burden, right? We do agree. It's your burden to show depreciation. I will accept that for the purpose of this. How did you meet that burden? It's a better way to put it on the evidence. It was uncontroverted. And for Jeremy, a guy who's been in this business for, I don't know how many years he testified to it. You know, he's retired now, so I'm sure by that time he was 40. Sat down with them and went through the numbers. The fact that it was an agreement doesn't mean that it wasn't valid. No, I understand. So I'm asking the same question to your opponent, Frank. Because I've read all the testimony of the record on this. It's about this question. The problem is that Sierra put all its eggs in the there is no depreciation. Right. But they had no burden. I agree with you that they lost on the no depreciation issue. But there's no controverted evidence. The only evidence in the record is 50% and 5%. Fair enough. We agree with each other so far. The question is, is that evidence? So there should be probative of depreciation, given the fact that it's really just the adjuster saying, well, I calculated it at 50%. Is that enough? It was uncontroverted. So it is enough. It's more than a scintilla. The trial court accepted it. And we need to disabuse you. I need to disabuse you of one more fact. And that fact is, this dam was not functional on January 1, 1997. In 1996, in June, the flume failed. The flume collapsed. The flume is that piece, the dam diverts the water into the flume. The flume hangs off the side of the problems or whatever is there to increase the speed so it goes to the power dam and generates more power because it's going faster than the river is going. Then the water comes back out into the river. Okay, so let's assume for a moment that you're right, that there's enough here for the judge to find a 50% and 5% rate. And all the calculations on that are just mathematical. They didn't tell me math would be involved, but it is. Okay. Why then shouldn't there be prejudgment interest on the ACV, not the actual recovery costs, actual reproduction costs, but on the ACV? The judge found, as a matter of fact, it was $19.8. It was $16.8 when they first laid there. They rounded it up. Yes, right. They rounded it up. And he only applied it to the previous number. He only applied the prejudgment interest to the $16 million something. That was a fixed number. In the insurance company's view, the depreciation was a fixed number. Why shouldn't you have written a check or at least offered to pay the ACV of that amount back in 2001? So, in your view of the world, this is an easily calculable number, and yet you only offered $1.2 million. Well, the mere fact that we ended up not prevailing on that issue, which, quite frankly, I still think is error, but it's been decided, so I can't argue that anymore. We all wish the previous panel had taken this case back, but that's it. We all have a way to live it. The problem is that the time to have asked for prejudgment interest was in April of 2008 when this case was tried. See, I agree with you with respect to actual reproduction costs, but what happened in 2008 is that Sierra Pacific got a negative verdict. The judge's verdict was you're entitled to $1.2 million. $1.2 million is ACV, but they've already paid you more than that. Oh, we paid them well. We paid them that amount. Yeah, you paid some of it. You get zero. Less deductible. Yeah, you get zero. That's right. They got the deductible. You get no soup, Sierra Pacific. You get zero. It's hard to fault them for not asking for prejudgment interest on Sierra. But it was never pled. It was given. Prejudgment interest is a matter of law. It's a post-trial issue. But the Supreme Court says it's also an element of damage. Right. But you have to plead it and prove it. No, our cases say that you raise the issue appropriately in a post-trial motion, a Rule 59e motion. And with respect, I think, to the extent that the other side is arguing that they get prejudgment interest on whatever it actually costs to replace the damage, if they choose to do that, I think they're wrong, because there was a judgment the first time about actual reduction costs, and they never sought prejudgment interest. But it's hard to fault them, in my mind, for not seeking it when they get zero. Can't they wait until they see it, when they get a positive award, before they seek it? But it goes all the way back to the pleadings. They never pled the claim for breach of the contract. They never pled a claim for damages. This case was never about damages. It was for a declaration as to how much something costs. When the judge got it back the second time, he decides, well, I'm going to enter judgment in a monetary mode, and I'm going to give a prejudgment interest. Actually, their complaint the first time through sought both declaratory relief and recovery under the policies. That's the place you ask for damages. Okay. Assume that you're wrong about the waiver argument. Tell me why there shouldn't be prejudgment interest here. Well. If they haven't waived it, do they get prejudgment interest? On the ACV, less depreciation. Probably. Okay. I can't come up with another argument. Okay. So it's a timing argument. Waiver is the dispositive argument. A timing argument. Yes, Your Honor. Okay. I'm sorry. Are we taking you off course? Put your shifts back on course. I reserve to rebut Mr. Peterson's undoubtedly stellar argument on the cross appeal. So if you have questions. Well, if he talks about the cross appeal, you may. And if he doesn't talk about the cross appeal, you're done. So that's up to you. Well, if you have more questions on the main appeal or the cross appeal, Amanda, you're too aggressive now. Otherwise, I'll take my chances and assume he's going to say something. Okay. You have a real opportunity, Mr. Peterson. I don't think you're going to pass it by. It has been a long time. Mr. Blanton and I actually are pretty good friends. It must be if you spent 20 years together. I'm not exactly sure what I'm permitted to talk about. You can talk about anything. Here's what I want to talk about. I want to go back to my main point, which is the math, because it is important to me. Do the math for me. Tell me what the depreciation should be. If it's not zero. This is right out of the Ninth Circuit. In this case, they said actual cash value equals fair market value. That's .1. They said fair market value equals reproduction cost plus depreciation. I'm sure we've all taught eighth grade algebra to our kids or grandkids. All you do is you do the equation. If you do the equation, you move the D over the minus sign to the plus sign. So if actual cash value is fair market value, excuse me, it's reproduction cost minus depreciation. Depreciation equals reproduction cost minus fair market value. The math is indisputable. That is the way you figure it out. So near view, then, there's never any depreciation. No, no. I mean, there might be. Well, but if we're using reproduction cost as a proxy for fair market value. No, no, no. This is not me talking. This is the Ninth Circuit talking. Not you talking. I'm quoting the Ninth Circuit, and they said that it's fair market value, excuse me, it's reproduction cost minus depreciation. We know what the reproduction cost is, 19.8. We don't know what the depreciation is. But if you just do the formula. Here's my problem. That's exactly what you argued the first time, sir. What you said was give me 19.8 because nothing should be subtracted from it. Now you're saying I can move around the pieces a little bit, but give me 19.8 because nothing should be subtracted from it. Or minus a tiny bit. Well, that's the point. You know, let's go back and figure out what it is. In your view, should we remand for another trial on depreciation? Well, I'd prefer that than to say the judge was right because the judge was wrong. I think I made my point on that, and I just wanted to make a couple of others maybe on that because you said something that struck me, and you said, which we doubt they will build, which we doubt they will build because it's been so long. If your house burns down, what you would expect the insurance company to pay you is, look, I'll give you fair market value for the house, or you can rebuild it if you want. If they say the fair market value is half of what it really is because of this big depreciation, what are you going to do? They're going to rebuild it, even though you don't want to. By a decision that this court makes that cuts the value of that dam in half and says we're going to give you, you can take $8 million in cash, or you can rebuild this thing for $30 million, what do you think they're going to do? They're going to rebuild it. Maybe that's not the right decision. When I ran the math, and I don't pretend to be a mathematician, if you got the recovery that the trial court thought you should get, which was $12 million something, and apply about 20 years of prejudgment interest to it, you're going to get a number on it. By the way, it seems to me you ought to want us to affirm the trial court in total because if we don't, you're going to go back again, and you're going to be stuck with the $12 million. I'm out of my time on that, but I think you ought to have the prejudgment interest in it. I think you can now write that again that we didn't get anything, which we could get in the long run. What you're saying is that you got what the trial judge thought was minus depreciation plus prejudged interest over time. You're right at the number you wanted anyway. Thank you. Mr. Blatt, there was about four words about your cross-appeal, but you can respond to those four words, but only about what was said about your cross-appeal. Okay. We normally don't have sir rebuttal, so it's limited to. All right. I don't have anything to say. I do have something to say, but you won't let me say it. Well, you had your opportunity on the main appeal. All right. Thank you. Thank you very much. The case to start is submitted, and we appreciate both counsel's arguments, and we are adjourned for this morning.
judges: Graber, Hurwitz, Foote